IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


WILLIAM E. CHAPPELLE,                                    Case No. 6:16-cv-00444-SB

        Plaintiff,                                    **OPINION AND ORDER**

        v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.

---

**BECKERMAN, Magistrate Judge.**

        William Chappelle ("Chappelle") brings this appeal challenging the Commissioner of

Social Security's ("Commissioner") denial of his applications for Social Security disability

insurance benefits and Supplemental Security Income under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 401-34, 1381-83f. The Court has jurisdiction to hear this appeal

pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons explained below, the Court

affirms the Commissioner's decision because it is free of legal error and supported by substantial

evidence.

**BACKGROUND**

Chappelle stands five-feet, seven-inches tall and his weight ranged from 194 to 238 pounds during the relevant time period. He was born in May 1978, making him thirty-two years old on July 8, 2010, the alleged disability onset date. Chappelle has an associate's degree, and his past relevant work includes time as a fabric home assembler, auto detailer/lot attendant, building materials attendant, auto supplies sales representative, laborer, and stock clerk. He alleges disability due primarily to lower back and hip pain. (*See* Tr. 705, 711, "On the average day do you experience pain? A. Yes. Q. Where? A. In the lower back and hips. Q. Anywhere else? A. That's it. . . . Q. Is there anything else . . . important about your physical or mental health condition or your ability to work that we haven't already asked you about today? A. No, I don't believe so. My pain is basically what causes me to not be able to work.").

On April 8, 2010, three months before the alleged onset of disability, Chappelle's treating physician, Dr. Michael Moser ("Dr. Moser"), referred Chappelle to a neurosurgeon, Dr. Andrea Halliday ("Dr. Halliday"), based on complaints of lower back pain and tingling in his legs. Neuroimaging revealed that Chappelle had "a small right paracentral disc protrusion at L4-5" and "degenerative disc disease at L4-5 and L5-S1 with loss of disc height." (Tr. 292.) Ultimately, Dr. Halliday opined that Chappelle's complaints stemmed from "discogenic disease and not anything radicular." (Tr. 290.) Dr. Halliday advised Chappelle and Dr. Moser that "the best way . . . to manage this would be for [Chappelle] to see a chiropractor and to lose weight." (Tr. 290.)

On May 12, 2010, Chappelle presented for a follow-up visit with Dr. Moser regarding treatment of his diabetes and his consultation with Dr. Halliday. Chappelle reported that he was "doing quite well" and "work[ing] out in a gym in Cottage Grove [one] hour every night, including aerobics and weights." (Tr. 435.) Dr. Moser noted that Chappelle exhibited "improved

control" of his diabetes, "good control" of his hypertension, and "markedly improved control" of his hyperlipidemia. (Tr. 436.) He advised Chappelle to continue "with diet, exercise, and weight loss." (Tr. 436.)

On June 2, 2010, Chappelle visited Dr. Paul Coelho ("Dr. Coelho") and underwent a lumbar discogram, which revealed "two levels of significant . . . concordant axial back pain[.]" (Tr. 294.)

On July 8, 2010, Chappelle underwent a "L4-5 and L5-S1 minimally invasive fusion." (Tr. 305.) A week later, Chappelle reported that he was "doing well" and planned to start physical therapy. (Tr. 311.) The next week, Chappelle reported "improving comfort levels although he continue[d] to have right leg numbness and mild weakness [similar] to his preoperative status." (Tr. 309.)

Chappelle returned to Dr. Moser's office on September 9, 2010. Chappelle reported that he was "doing fairly well other than his back," which made it difficult for him to exercise. (Tr. 433.) Dr. Moser noted that Chappelle exhibited fair control of his diabetes, and "emphasized to [Chappelle] the need for compliance with medication, diet, and exercise." (Tr. 433.)

On September 21, 2010, Chappelle presented for a postoperative visit with his surgeon, Dr. Glenn Keiper, Jr. ("Dr. Keiper"). Chappelle reported that he was "doing well," he was "still having difficulty at night with bilateral hip pain," his back pain had reduced "significantly," and he had not pursued "physical therapy for financial reasons."[1] (Tr. 326.) Dr. Keiper advised

---

[1] To the contrary, the record reveals that Chappelle participated in physical therapy both before and after his consultation with Dr. Keiper on September 21, 2010. (*See* Tr. 391-92, indicating that Chappelle was seen at Cottage Grove Physical Therapy on August 30, 2010, and September 23, 2010). However, the record also reveals that he had "a history of no shows and cancellations," and stopped attending physical therapy on September 30, 2010. (Tr. 394.) Chappelle informed his therapist that he stopped attending because he lost his health insurance

Chappelle to stop taking "narcotic medications as [soon as] possible," noted that physical therapy was "very important," and added that Chappelle's x-rays looked "great for this point in his fusion process." (Tr. 326.)

From November 27, 2010 through December 3, 2010, Chappelle was hospitalized by Dr. Moser "with acute pancreatitis due to marked hyperlipidemia and hypertriglyceridemia." (Tr. 426.)

On February 7, 2011, Chappelle visited Dr. Moser and reported that he needed "some type of an excuse indicating that he is unable to participate in the gymnasium here in town since he has had his back surgery." (Tr. 424.) Chappelle added that "he was not able to obtain his Xopenex or Tricor through the patient's assistance program," but continued to take Norco for back pain. (Tr. 424-25.) Dr. Moser provided Chappelle with a handwritten note, stating "Due to personal medical reasons, Mr. Chappelle cannot participate in gym work" effective July 2010. (Tr. 425.)

Chappelle returned to Dr. Moser's office on June 8, 2011. Chappelle reported that he continued to experience back pain and noted that he was "eating the wrong stuff" at times. (Tr. 421.) Dr. Moser referred Chappelle to a neurosurgeon, Dr. Erik Hauck ("Dr. Hauck"), based on his complaints of continued back pain. Dr. Hauck "declined surgery" but noted that a "repeat" magnetic resonance imaging ("MRI") might be necessary "if symptoms increased." (Tr. 418, 422.)

In February 2012, Chappelle filed his application for Supplemental Security Income benefits.

---

coverage, and he did not follow up on his therapist's offer to participate in a payment plan. (Tr. 394.)

On April 19, 2012, Chappelle visited Dr. Moser and reported that he continued "to have low back pain radiating to bilateral hips, left greater than right, and into his 'tailbone.'" (Tr. 535.) Chappelle also reported that frequency, duration, and intensity of his pain had increased, that he needs to stop while walking to pick up the mail, and that he is unable to play with his young daughter. Dr. Moser noted that a neurosurgeon, Dr. Hauck, had "advised conservative treatment." (Tr. 535.) Dr. Moser ordered an MRI of Chappelle's lumbar spine "in reference to spinal stenosis," which might "require reconsultation with Dr. Hauck pending review of MRI." (Tr. 536.)

On April 26, 2012, an MRI of Chappelle's lumbar spine showed signs of spinal stenosis and "[s]table" degenerative and postsurgical changes. (Tr. 548.) Around the same time, an MRI of Chappelle's hips revealed "mild osteoarthritis of the bilateral hips," and an MRI of his left knee was normal in appearance. (Tr. 546-47.) A subsequent MRI of the lumbar spine (taken from bending views) revealed normal alignment, "[s]table postsurgical changes of fusion at L4-L5 and L5-S1," and "[m]ultilevel degenerative disc disease, spondylosis and facet arthropathy." (Tr. 545.)

On May 17, 2012, Chappelle presented for a follow-up consultation with Dr. Hauck regarding his back pain. Dr. Hauck noted that he reviewed Chappelle's MRI, and that the MRI did "not demonstrate any significant nerve root compression," but it did show signs of "progressive arthritis, particularly in the L5 vertebra compare to the previous MRI from [2011]." (Tr. 528.) Dr. Hauck concluded that Chappelle's pain "is largely due to osteoarthritis," and the

progression is "consistent with failed back syndrome," but not "nerve compression syndrome."[2] (Tr. 528.)

In a treatment record dated June 27, 2012, Dr. Moser noted that Dr. Hauck offered "only conservative treatment" (a steroid used to treat inflammatory conditions), and Chappelle found minimal relief, Chappelle had "not seen Dr. Hauck again with consideration of any further treatment, such as injections into his back," and Chappelle reported being in constant pain, "yet only takes Percocet [twice a day]." (Tr. 520-21; *see also* Tr. 645, noting on December 17, 2012, that Dr. Hauck "determined [in May 2012] that conservative treatment would be effective at this point".)

On July 24, 2012, Dr. William Backlund ("Dr. Backlund"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 69-70.) Based on his review of the record, Dr. Backlund found that Chappelle could lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, or walk up to six hours in an eight-hour workday; push or pull in accordance with his lift and carry restrictions; frequently stoop and climb ramps and stairs; occasionally crouch, crawl, and climb ladders, ropes, or scaffolds; and balance without limitation. He also found no evidence of manipulative, visual, communicative, or environmental limitations.

In a treatment record dated August 17, 2012, Dr. Moser listed "continued back pain with consideration of failed back syndrome" as one of Chappelle's medical issues, and discussed with Chappelle the "need for compliance with diet, exercise, weight loss, and medication." (Tr. 509-10.)

---

[2] Failed back syndrome is a "generalized term often used to describe the condition of patients who have not had a successful result with spine surgery." *Edwards v. Barnhart*, 319 F. Supp. 2d 1283, 1287 n.19 (N.D. Ala. 2004).

On September 20, 2012, Dr. Sharon Meyers ("Dr. Meyers"), a non-examining state agency physician, completed a physical residual functional capacity assessment, adopting Dr. Backlund's findings. (Tr. 89-91.)

On October 22, 2012, Chappelle visited Susan Grzesiak ("Grzesiak"), a qualified mental health professional, and underwent a Comprehensive Adult Mental Health Assessment.[3] Grzesiak noted that Chappelle's wife worked at the clinic and "brings in limited income," that Chappelle lives with his wife, mother, and two daughters, that the family is "eligible for food stamps periodically," and that Chappelle "will soon lose his unemployment money."[4] (Tr. 574-75.) Grzesiak's diagnostic impressions were dysthymic disorder, health and pain issues, economic and physical stressors, and a Global Assessment of Functioning ("GAF") score of forty-five.[5]

On November 20, 2012, Chappelle visited Grzesiak and reported that he was "putting up with more pain so that he can be alert to interact with his children while they are off on the holidays." (Tr. 625.) Chappelle also reported that he "successfully graduated" from an online associate's degree program. (*See* Tr. 625; *see also* Tr. 408, 574, 695, describing the online program.)

---

[3] Qualified mental health professionals "are defined as 'other sources,' not acceptable medical sources, and are thus entitled to lesser deference." *Moon v. Colvin*, 139 F. Supp. 3d 1211, 1222 (D. Or. 2015) (citations omitted).

[4] Chappelle "first received unemployment through California and then the Oregon State educational program picked up further unemployment while giving him the opportunity to go through school." (Tr. 575.)

[5] A GAF score of forty-five "indicates serious symptoms and serious impairment in social or occupational functioning." *Moreno v. Astrue*, No. 11-2454, 2013 WL 599962, at *8 (E.D. Cal. Feb. 14, 2013).

On January 16, 2013, Chappelle scored in the moderately depressed range on the Beck Depression Inventory.[6]

On March 20, 2013, Chappelle was taken to a hospital and given fluids and glucose, because he experienced an episode of hypoglycemia while hiking on a trail in Astoria, Oregon. (Tr. 658.) Chappelle reported that he had been "dieting and losing weight," which meant his blood sugars had "been decreasing" and he was using less insulin. (Tr. 658.) Dr. Moser provided Chappelle with a "Glucagon Pen to be used if he is hiking and requires a boost in glucose[.]" (Tr. 670.)

On August 15, 2013, Dr. Moser noted that Chappelle reported feeling "pretty good," that he had a disability hearing scheduled because "[h]e apparently is permanently disabled due to his chronic back condition," that he felt nauseated after eating "chili at the rodeo in Cottage Grove," and that he continued to lose weight by managing his portions, eating less, and not eating when full. (Tr. 663.)

On November 15, 2013, Chappelle visited Grzesiak and underwent a second Adult Mental Health Assessment. Grzesiak noted that Chappelle attended therapy every two to three weeks over the course of the past year, was eating better and had lost thirty-five pounds, had "made progress over the past year," and was able to reduce "his high frustration and irritability" with "effective" medication. (Tr. 571.) Grzesiak added that Chappelle continued to meet the criteria for a dysthymic disorder, but major depression was ruled out and the criteria for an anxiety disorder were not satisfied.

---

[6] The Beck Depression Inventory is "a subjective measure of depressive symptoms." *Cassino v. Astrue*, No. 09-8217, 2011 WL 1211605, at *11 (D. Ariz. Mar. 31, 2011) (citation omitted).

In an addendum dated November 4, 2013, Grzesiak updated Chappelle's file to reflect that he also suffers from posttraumatic stress disorder stemming from emotional abuse by his father. (*See* Tr. 566; *see also* Tr. 568, 572, 574, describing the "emotional abuse" Chappelle described).

On November 14, 2013, Grzesiak completed a Mental Residual Functional Capacity Assessment. Grzesiak opined that Chappelle suffers from severe limitation in four of sixteen categories of mental activity that were rated, and moderately severe limitation in eight categories. (Tr. 632-35.)

On December 23, 2013, Chappelle was referred to Dr. Alison Prescott ("Dr. Prescott") for a psychological evaluation. Based on her evaluation and review of Chappelle's records, Dr. Prescott's diagnostic impressions were dysthymic disorder and an anxiety disorder not otherwise specified. In a medical source statement dated December 31, 2013, Dr. Prescott also opined that Chappelle suffers from marked limitations (i.e., substantial loss in the ability to effectively function) in carrying out complex instructions and the ability to make judgment on complex work-related decisions. (Tr. 682-84.)

An administrative law judge ("ALJ") convened a hearing on March 4, 2014, at which Chappelle testified about the limitations resulting from his impairments. Chappelle testified that he last worked in 2010 as a fabric shop manager, he stopped working because he "had back surgery," his medications make him "sleepy" and make his "head spin," he can lift no more than a gallon of milk "off and on over the course of the day," and he can sit between one and two hours at a time, stand for about two hours, and walk for thirty minutes to an hour. (Tr. 696, 700-01.) Chappelle added that he spends "four hours a day" lying down due to lower back pain, can bathe and get dressed without assistance, is compliant with his "diabetic diet," cares for his nine-

year-old daughter while his wife is at work, and occasionally drives up to "[f]our hours" while running errands, going to the store, and attending medical appointments. (Tr. 701-04, 707.) Chappelle described his typical day as consisting of preparing meals, resting, taking pain medications, walking down the driveway to meet his daughter after school, and helping his daughter with her homework. He also stated that he only experiences pain in his "lower back and hips," has "good" control of his diabetes, lost weight recently after he stopped "eating as much," exercises by walking "a quarter of a mile . . . [t]hree to four times a day," and "get[s] depressed real easy." (Tr. 705-06, 709.)

The ALJ posed a series of questions to a vocational expert ("VE") who testified at Chappelle's hearing. First, the ALJ asked the VE to assume that a hypothetical worker of Chappelle's age, education, and work experience could perform work that involved: (1) lifting twenty pounds occasionally and ten pounds frequently, (2) sitting, standing, and walking "each six hours in an eight-hour day for a combined total of eight hours of activity, (3) "the option to sit or stand at will while still performing essential tasks," (4) no climbing of ladders, ropes, or scaffolds, no exposure to "hazards such as unprotected heights and large moving equipment including motor vehicles," and no contact with the public or "team work assignments," (5) occasionally stooping, crouching, crawling, kneeling, and climbing ramps and stairs, and (6) the ability to "understand, remember and carry out simple instructions." (Tr. 715.) The VE testified that the hypothetical worker could not perform Chappelle's past relevant work, but could be employed as a plastic mold machine attendant, small products assembler, and photocopy machine operator. The VE added that there are 27,000 plastic mold machine attendant jobs, 362,500 small products assembler jobs, and 118,000 photocopy machine operator jobs available in the national economy.

Second, the ALJ asked the VE to assume that the hypothetical worker described above would instead be limited to "standing and walking a combined total of four hours" in an eight-hour workday, and sitting "for the other four" hours. (Tr. 717.) The VE testified that the same three jobs would be available because such limitations were effectively equivalent to a sit-stand option. (*See* Tr. 717, "Q. . . . Is that substantially different than a sit, stand option[?] . . . A. Not really. I think . . . these jobs that I identified, the reason I chose them is they're usually performed at a bench, bench type work and [the second hypothetical you posed is] compatible with that.")

Third, the ALJ asked the VE to assume that the hypothetical worker described above would instead be limited to lifting ten pounds occasionally and less than ten pounds frequently, standing and walking no more than two hours in an eight-hour workday, and siting for at least six hours. The VE testified that the hypothetical worker could be employed as a photocopy operator, but the number jobs available in the national economy would be reduced to 59,000. (*See* Tr. 718, noting that "at least one half of the [118,000] jobs would remain"). The VE added that the hypothetical worker could be employed as a document preparer and eyeglasses assembler, and that there are 132,000 document preparer jobs and 68,000 eyeglasses assembler jobs available in the national economy.

Finally, the ALJ and Chappelle's attorney asked the VE about whether a hypothetical worker could sustain competitive employment if he needed to lie down for two to four hours during an eight-hour workday, was unable to sustain the level of attention required to perform "simple tasks for two hours without significant interruption," or was absent more than two days per month. (Tr. 719-20.) The VE confirmed that such limitations would preclude competitive employment.

In a written decision issued on May 16, 2014, the ALJ applied the five-step sequential process set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), and found that Chappelle was not disabled. *See infra*. The Social Security Administration Appeals Council denied Chappelle's petition for review, making the ALJ's decision the Commissioner's final decision. Chappelle timely appealed.

## THE FIVE-STEP SEQUENTIAL PROCESS

### I. LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal [one of the listed impairments]? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers

in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.  THE ALJ'S DECISION

The ALJ first determined that Chappelle had not engaged in substantial gainful activity since July 8, 2010, the alleged disability onset date. At the second step, the ALJ concluded that Chappelle had the severe medically determinable impairments of "lumbar degenerative disc and joint disease status post-laminectomy with failed back syndrome; mild osteoarthritis of the bilateral hips; insulin dependent diabetes mellitus II; possible gastroparesis; obesity; dysthymic disorder; and anxiety disorder, NOS." (Tr. 15.) At the third step, the ALJ found that Chappelle did not have an impairment or combination of impairments that met or equaled one of the Listed Impairments.

The ALJ then assessed Chappelle's residual functional capacity ("RFC") and found that he could perform light exertion work that involves (1) lifting and carrying twenty pounds occasionally and ten pounds frequently, (2) sitting, standing, and walking "each six hours of an eight-hour workday for a combined total of eight hours of activity," (3) the option of sitting or standing "at will at intervals that will not interrupt performance of essential work tasks," (4) no climbing of ladders, ropes, and scaffolds, no public contact or teamwork assignments, and "no exposure to hazards such as unprotected heights and large moving equipment including motor vehicles," and (4) no more than occasional stooping, crouching, crawling, kneeling, and climbing ramps and stairs. (Tr. 18.) The ALJ added that Chappelle can understand, remember, and carry out simple instructions. At the fourth step, the ALJ found that Chappelle is not capable of performing his past relevant work. At the fifth step, the ALJ concluded that there were other jobs

existing in significant numbers in the national economy that Chappelle could perform, such as a plastic mold machine operator, small products assembler, and photocopy machine operator. Accordingly, the ALJ determined that Chappelle was not disabled within the meaning of the Social Security Act.

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the district court must uphold the ALJ's decision and may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## DISCUSSION

In this appeal, Chappelle argues that the ALJ erred by: (1) failing to provide clear and convincing reasons for discounting Chappelle's subjective symptom testimony; (2) failing to offer legally sufficient reasons for discounting the opinion evidence provided by Chappelle's

treating mental health professional, Grzesiak, and the examining psychologist, Dr. Prescott; and (3) failing to meet her burden, at step five of the sequential process, of establishing that other jobs existed in the national economy that Chappelle was capable of performing. As explained below, the Court concludes that the Commissioner's decision is free of legal error and supported by substantial evidence in the record. Accordingly, the Court affirms the Commissioner's denial of benefits.

## I. CREDIBILITY DETERMINATION

### A. Applicable Law

Absent an express finding of malingering, an ALJ must provide clear and convincing reasons for rejecting a claimant's testimony:

> Without affirmative evidence showing that the claimant is malingering, the [ALJ]'s reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's [subjective] complaints.

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 (9th Cir. 1999) (citations omitted). Clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) ("[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly

contrary to 42 U.S.C. § 423(d)(5)(A).'" (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989))).

**B.    Application of Law to Fact**

There is no affirmative evidence that Chappelle is malingering and, therefore, the ALJ was required to provide clear and convincing reasons for discrediting Chappelle's symptom testimony. Upon review, the Court concludes that the ALJ satisfied the clear and convincing reasons standard.

First, the ALJ found Chappelle less than entirely credible based on inconsistencies in his testimony. Such inconsistencies may justify rejecting a claimant's subjective symptom testimony. *See Bartlett v. Colvin*, No. 1:14–cv–00142–SB, 2015 WL 2412457, at *12 (D. Or. May 12, 2015) (explaining that "inconsistent statements" constitute a specific, clear, and convincing reason for discounting a claimant's subjective symptoms testimony) (citation omitted). It was reasonable for the ALJ to conclude that Chappelle's inconsistent testimony undermined his claim of disability. As the ALJ noted in her written decision, Chappelle informed Oregon Vocational Rehabilitation Services that "he did not believe he had the ability to work" and was asked to return when he was "motivated to participate in employment activities," yet Chappelle informed Dr. Prescott that he was applying for jobs during the period of alleged disability and "would accept a job if one was offered." (Tr. 286, 676.) Chappelle also testified during the hearing that he can only lift a gallon of milk and needs to lie down for four hours per day, yet his written testimony states that he can lift up to forty pounds and does not require rests or naps. (Tr. 20, 243, 246, 701.) Furthermore, Chappelle testified that he is compliant with his "diabetic diet" and "unable to play" with his daughter, yet the record reveals that Chappelle at times admitted to "eating the wrong stuff" (which is likely why Dr. Moser repeatedly emphasized the need for compliance with his diabetic diet), and stated that he takes his daughter

to the park, "play[s] games," and participates in "various after school activities."[7] (Tr. 239, 421, 433, 509, 535, 677, 702.)

Second, the ALJ discounted Chappelle's testimony on the ground that he was not always compliant with his treatment plan. (*See* Tr. 21, noting that "the treatment records show problems with compliance in terms of [blood sugar] monitoring, medications, and diet.") Medical noncompliance is a clear and convincing reason for discounting a claimant's subjective symptom testimony. *Bowers*, 2012 WL 2401642, at *9. The record supports the ALJ's conclusion. (*See* Tr. 421, admitting to "eating the wrong stuff," Tr. 433, emphasizing the need for "compliance with medication, diet, and exercise," Tr. 505-06, noting that Chappelle's wife contacted Dr. Moser and reported that Chappelle's blood sugar levels were irregular after eating ice cream at Dairy Queen, Tr. 509, admitting on August 17, 2012, that he was "eating better now," Tr. 656, indicating on February 14, 2013, that Chappelle reported "doing much better" after he "changed his diet").

Third, the ALJ discounted Chappelle's testimony based on evidence of conservative treatment. (*See* Tr. 21, noting that the record "shows only conservative treatment since the 2010 surgery"). The Ninth Circuit has "previously indicated that evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Bartlett*, 2015 WL 2412457, at *12 (quoting *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007)). The record indicates that Dr. Moser referred Chappelle to a neurosurgeon, Dr. Hauck, who examined Chappelle and reviewed his MRI results. Although Drs. Moser and Hauck considered the fact

---

[7] The ALJ's decision did not explicitly rely on all of these inconsistencies, but it is nevertheless appropriate for the Court to consider additional support for a ground on which the ALJ relied. *See Fenton v. Colvin*, No. 6:14-00350-SI, 2015 WL 3464072, at *1 (D. Or. June 1, 2015) ("The Court is not permitted to affirm the Commissioner on a ground upon which the Commissioner did not rely, but the Court is permitted to consider additional support for a ground on which the ALJ relied.").

that Chappelle's most recent surgery was not successful, Dr. Hauck nevertheless determined that conservative treatment would be effective. (*See* Tr. 509, describing "continued back pain with consideration of failed back syndrome" as one of Chappelle's "ongoing medical issues" in August 2012, Tr. 645, noting on December 17, 2012, that Dr. Hauck previously "determined that conservative treatment would be effective at this point" in treating Chappelle's ongoing back pain). Furthermore, Dr. Moser recommended diet, exercise, and weight loss (Tr. 433, 436, 509-10), which are conservative treatment measures. *See Martin v. Colvin*, No. 3:14-01603-SB, 2016 WL 890106, at *11 (D. Or. Feb. 9, 2016) (explaining that diet and exercise are conservative types of treatment).

Fourth, the ALJ discounted Chappelle's symptom testimony based, in part, on conflicting medical evidence. *See Bowers*, 2012 WL 2401642, at *9 (noting that conflicting medical evidence is a clear and convincing reason for discounting a claimant's testimony). For example, the ALJ assigned "significant weight" to the non-examining state agency physicians' assessments, noting that there are no other assessments on record that "find greater physical limitations." (Tr. 21.) This conflicting medical evidence was a clear and convincing reason for discounting Chappelle's testimony.

The ALJ also discounted Chappelle's testimony because it is inconsistent with his reported activities. (*See* Tr. 21, noting that Chappelle testified that he is able to drive up to four hours a day, despite allegedly experiencing dizziness and fatigue as a result of his pain medications). "Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination." *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014). It was reasonable for the ALJ to find that Chappelle's reported activities, which included earning an associate's degree during the alleged period of disability, caring for

his nine-year-old daughter, walking up to a mile per day, hiking, assisting with household chores, participating in "various after school activities," and applying for jobs and reportedly being willing to accept a job offer post-alleged onset date, were incompatible with his reported limitations. (Tr. 239-41, 625, 658, 675-78, 701-04, 706-07.)

Based on the foregoing, the Court declines to second-guess the ALJ's credibility determination because it is reasonable and supported by substantial evidence. *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) ("[T]he ALJ's interpretation of [the claimant's] testimony may not be the only reasonable one. But it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second-guess it."); *Dowell v. Berryhill*, No. 16-614-SI, 2017 WL 1217158, at *5 (D. Or. Apr. 3, 2017) (noting that the court may uphold an ALJ's credibility determination even if some of the reasons the ALJ provided were not legally sufficient).

## II.    MEDICAL OPINION EVIDENCE

### A.    Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (citation omitted). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Ryan v. Comm'r Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citation omitted).

### B.    Application of Law to Fact

Chappelle argues that the ALJ erred in discounting the opinion evidence provided by his treating mental health professional, Grzesiak, and the examining psychologist, Dr. Prescott. The Court disagrees.

#### 1.    Grzesiak

Chappelle acknowledges that Grzesiak is a qualified mental health professional and licensed clinical social worker, and thus is considered an "other source" under the Social Security regulations. (Pl.'s Opening Br. at 13.) An ALJ may reject evidence from an "other source" by providing "a germane reason for doing so." *Cachu v. Colvin*, No. 14–1279, 2015 WL 5232524, at *5 (E.D. Cal. Sept. 8, 2015) (citations omitted). Germane reasons for discounting evidence from an "other source" include: (1) the fact that the other source relied to a large extent on a claimant's properly discounted self-reports, *Lombard v. Colvin*, No. 13-1530–MC, 2015 WL 1477993, at *3 (D. Or. Mar. 31, 2015); (2) the fact that the evidence from the other source is inconsistent with "objective evidence," *Ramirez v. Berryhill*, No. 15-2988, 2017 WL 1196728, at

*15 (N.D. Cal. Mar. 31, 2017); and (3) the fact that the other source's opinion is "inconsistent with the claimant's activities," *Vallandingham v. Colvin*, No. 14-4847, 2015 WL 1467189, at *2 (C.D. Cal. Mar. 26, 2015).

Here, the ALJ provided a germane reason for discounting Grzesiak's opinion. The ALJ discounted Grzesiak's opinion—which concerned mental health-related impairments and limitations—based on its inconsistency with Chappelle's activities. For example, the ALJ noted that Grzesiak's opinion that Chappelle suffers from severe limitations in four categories of mental activity was inconsistent with Chappelle's "ability to engage in and complete college course work." (Tr. 23.) The ALJ also noted that Chappelle's "routine" included transporting his wife and daughter to and from work and school, which undermined Grzesiak's opinion that "he cannot be punctual or adhere to a routine." (Tr. 23.) The ALJ added that Chappelle was previously able to sustain gainful employed despite any mental impairments.

Chappelle concedes that he was able to complete an online associate's degree program, but notes that he reported being "stressed out" when asked to "speak on a web cam." (Pl.'s Opening Br. at 19; Pl.'s Reply Br. at 4.) Chappelle argues that further proceedings are necessary because the ALJ did not "address the extent to which [he] was allowed to work at his own pace," or question him "about his coursework" or the extent to which "the attention required was comparable to the work setting." (Pl.'s Opening Br. at 19; Pl.'s Reply Br. at 4.)

Chappelle's arguments are not persuasive. During the hearing, Chappelle was presented with an opportunity to discuss his online associate's degree program, any coursework, and the extent to which his mental impairments interfered with his performance. Chappelle declined the opportunity to do so, and testified that back and hip pain are the only conditions that prevent him from working. (*See* Tr. 705, 711, "On the average day do you experience pain? A. Yes. Q.

Where? A. In the lower back and hips. Q. Anywhere else? A. That's it. . . . Q. Is there anything else . . . important about your physical or mental health condition or your ability to work that we haven't already asked you about today? A. No, I don't believe so. My pain is basically what causes me to not be able to work."). Given this testimony (or lack thereof) from Chappelle, it was reasonable for the ALJ to conclude that Chappelle's reported activities were inconsistent with Grzesiak's opinion. (*See, e.g.*, Tr. 675, reporting that Chappelle "got mostly A's in these [online associate's degree program] courses and could handle the work load with assignments"). Thus, the ALJ provided a germane reason for discounting Grzesiak's opinion.

The ALJ also appeared to discount Grzesiak's opinion because it relied to a large extent on Chappelle's properly discounted reports. For example, the ALJ noted that Grzesiak "mainly focus[e]d on feelings of inadequacy due to physical complaints." (Tr. 21.) The ALJ then stated that Chappelle's reports to Grzesiak "described physical limitations significantly different from those reported at [the] hearing." (Tr. 22.) In the Court's view, the ALJ's suggestion that Grzesiak relied largely on Chappelle's own self-reports is supported by Grzesiak's treatment records. That constitues another germane reason for discounting Grzesiak's opinion. *See Lombard*, 2015 WL 1477993, at *3 (noting that overreliance on properly discounted self-reports is a germane reason for discounting evidence from an other source).

For these reasons, the Court concludes that the ALJ did not err in discounting Grzesiak's opinion.

### 2.    Dr. Prescott

In his opening brief, Chappelle argues that the ALJ "erred in failing to credit" the opinion of his examining psychologist, Dr. Prescott. (Pl.'s Opening Br. at 2, 12.) In support of his argument, Chappelle challenges the ALJ's assertions that Dr. Prescott included vague statements

in her opinion about Chappelle's ability to tolerate "normal work stress," and relied to a large

extent on Chappelle's properly discounted self-reports. (*See* Pl.'s Opening Br. at 16.)

The Court concludes that the ALJ provided legally sufficient reasons for discounting Dr.

Prescott's opinion. The ALJ discounted Dr. Prescott's opinion because it was based, in part, on

areas outside of her expertise, and because she relied on Chappelle's less than credible self-

reports. (*See* Tr. 23, noting that Chappelle informed Dr. Prescott that he was "stressed out" when

he had to speak on a web cam during his associate's degree program and Dr. Prescott then

opined that his ability to "tolerate normal work stresses" was an issue, and that Dr. Prescott cited

"physical demands" as a "barrier to working," even though she was "not qualified to comment

on such matters"). These are legally sufficient reasons for discounting Dr. Prescott's opinion. *See*

*Adams v. Astrue*, No. 11-477–MO, 2012 WL 1664815, at *6 (D. Or. May 10, 2012) ("[The

treating psychologist's] assessments of impairments outside her area of expertise and

consideration of [the claimant's] self-reports that the ALJ considered unreliable also support his

decision to discount her opinions." (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir.

2008))).

Chappelle disputes the ALJ's purported assertion that Dr. Prescott relied "solely upon"

his self-reports. (Pl.'s Opening Br. at 16.) The ALJ's decision does not conclude that Dr. Prescott

relied "solely" on Chappelle's properly discounted reports. Rather, the ALJ's decision, at best,

suggests that Dr. Prescott relied to a large extent, or placed undue reliance, on Chappelle's

reports. Chappelle also argues that Dr. Prescott's report "would have been incomplete" if she

"omitted any mention" of Chappelle's "physical condition." (Pl.'s Reply Br. at 6.) The Court

disagrees, and concludes that the ALJ properly discounted Dr. Prescott's opinion. *See Adams*,

2012 WL 1664815, at *6 ("Dr. Nikunen's assessments of impairments outside her area of

expertise and consideration of Ms. Adams's self-reports that the ALJ considered unreliable also support his decision to discount her opinions." (citing *Tommasetti*, 533 F.3d at 1041)).

Finally, the Court notes that the VE hypothetical derived from Chappelle's RFC determination accounts for the most significant limitations expressed by Dr. Prescott. Indeed, in her medical source statement dated December 31, 2013, Dr. Prescott opined that Chappelle suffers from marked limitations in his ability to carry out, understand, and remember *complex* instructions. (Tr. 682.) In all other categories that were rated, Dr. Prescott opined that Chappelle's degree of impairment was at or below the moderate level (e.g., "more than a slight limitation in this area but the individual is still able to function satisfactorily"). (Tr. 682-83.) Those categories include the ability to (1) interact appropriately with the public, supervisors, and co-workers, (2) respond appropriately to usual workplace situations and changes in a routine work setting, and (3) make judgments on complex work-related decisions. (Tr. 683.) By comparison, the ALJ's RFC limits Chappelle to work that requires only the ability to carry out, understand, and remember *simple* instructions, and involves no public contact or teamwork assignments. Thus, the RFC is consistent with Dr. Prescott's opinion. (*Cf.* Tr. 682, opining that Chappelle experiences no limitation in his ability to carry out, understand, and remember simple instructions, and only mild impairment—e.g., "a slight limitation . . . , but the individual can generally function well"—in his ability to make judgments on simple work-related decisions).

## III. STEP-FIVE BURDEN

The remaining issue to address is Chappelle's assertion that the ALJ erred by failing to meet her burden, at step five of the sequential process, of establishing that other jobs existed in the national economy that Chappelle was capable of performing. This argument is based on the assignments of error discussed and rejected above. (*See* Pl.'s Opening Br. at 20, noting only that Grzesiak's opinion would support a remand for benefits if she was "properly credited," and that

Chappelle testified that he needs to "lie down several hours during the day," which would also support a finding of disability). The ALJ met her burden at step five because the VE hypothetical derived from the RFC accounted for all credible limitations. *See De Botton v. Colvin*, 672 F. App'x 749, 751 (9th Cir. 2017) ("[B]ecause the ALJ posed a hypothetical question to the [VE] that [was derived from an RFC that] contained all of [the claimant's] credible limitations, the [VE's] testimony was substantial evidence for the ALJ's findings.").

## CONCLUSION

For the reasons stated, the Court affirms the Commissioner's decision because it is free of legal error and supported by substantial evidence.

IT IS SO ORDERED.

DATED this  2nd  day of June, 2017.

_____
STACIE F. BECKERMAN
United States Magistrate Judge